UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 4:19-CR-0207-2 |
| | ) | |
| | ) | (BRANN, D.J.) |
| v. | ) | |
| | ) | (ARBUCKLE, M.J.) |
| DAMONICO L. HENDERSON, | ) | |
| Defendant | ) | |

<u>MEMORANDUM FOR COVID-19 BAIL DECISION</u>
*Defendant Henderson's Motion for Bail, Doc. 76*

I.  INTRODUCTION

Before the Court is Mr. Henderson's Motion for Bail (Doc. 76). Along with the Motion, a Brief (Doc. 77), the required notice (Doc. 78) requesting a hearing, the Government's Brief in Opposition (Doc. 81), and Mr. Henderson's Reply Brief (Doc. 85) were filed. For the reasons detailed in this Memorandum, the request for a hearing and release from detention will be denied.

II. BACKGROUND & PROCEDURAL HISTORY

This case began with the indictment of three people, including Damonico Henderson, on June 27, 2019. (Doc. 5). Mr. Henderson had his Initial Appearance and Arraignment on July 12, 2019. (Doc. 36). At that time, the Government moved for detention, which Mr. Henderson did not contest. Thus, Mr. Henderson was remanded to federal custody. (Doc. 39).

On July 15, 2019, Judge Brann issued a Scheduling Order (Doc. 41) which scheduled, among other things, jury selection and trial for September 9, 2019.

On July 18, 2019, Judge Brann issued an Order granting Co-Defendant's Motion to Continue jury selection and trial[1] to November 4, 2019. (Doc. 46).

On August 20, 2019, Mr. Henderson filed a Motion for Bail and Revocation of Pre-trial Detention Order (Doc. 54) and a Brief in Support (Doc. 55). The Government filed a Brief in Opposition (Doc. 56). On September 5, 2019, a hearing was held regarding Mr. Henderson's Motion. On September 13, 2019, I issued an Order deferring a decision on the Motion for Bail until further information was provided to the Court. (Doc. 59).

On October 9, 2019, Judge Brann issued an Order granting Mr. Henderson and Co-Defendants' Joint Motion to Continue jury selection and trial from November 4, 2019, to February 3, 2020. (Doc. 68).

On October 28, 2019, I issued an Order denying Mr. Henderson's Motion for Bail, because the Government proved by clear and convincing evidence that no condition or combination of conditions could reasonably assure the safety of persons or the community given that Mr. Henderson is subject to a lengthy period of incarceration if convicted, Mr. Henderson was involved in this conspiracy while on

---

[1] Mr. Henderson did not join in this Motion (Doc. 42).

supervision, and Mr. Henderson's wife was an unsuitable third party custodian or companion. (Doc. 71).

On January 10, 2020, Judge Brann issued an Order granting Mr. Henderson and Co-Defendants' Joint Motion to Continue jury selection and trial from February 3, 2020, to April 6, 2020. (Doc. 73). On March 11, 2020, Judge Brann issued an Order granting Mr. Henderson and Co-Defendants' Joint Motion to Continue jury selection and trial from April 6, 2020, to July 6, 2020. (Doc. 75).

On March 27, 2020, Mr. Henderson filed a second Motion for Bail (Doc. 76) and Brief in Support (Doc. 77), seeking release from his pretrial detention. That same day, I issued an Order instructing the parties to confer by telephone to determine if a joint resolution could be reached. On March 30, 2020, Mr. Henderson filed Notice (Doc. 78) that a joint resolution could not be reached regarding his pretrial detention. On April 2, 2020, the Government filed a Brief in Opposition (Doc. 81). Mr. Henderson filed a Reply Brief (Doc. 85) on April 7, 2020.

### III.   COURT PROCEDURE FOR COVID-19 CASES

Anticipating a significant number of requests for reconsideration of bail in light of the COVID-19 pandemic, the Court instituted an expedited procedure to hear these cases in an orderly and deliberate fashion. The filing of a bail motion citing COVID-19 as a reason for release from detention will be specifically designated and

a docket entry will automatically notify counsel about the expedited procedures. That entry was made in this case on March 27, 2020.

IV. STANDARD OF REVIEW

The Court has continuing jurisdiction to review its own bail decisions. In this case the request for reconsideration regarding bail is made under 28 U.S.C. § 3141, which is the general release and detention authority of the Court, and 28 U.S.C. § 3142(i) which states:

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

18 U.S.C. § 3142.

The question presented by this Motion requires an analysis of the Bail Reform Act under pandemic conditions. Does this petition present a "compelling reason" to alter a previous bail decision?

V. REVIEW OF PREVIOUS BAIL DECISION

The original Order of Detention was filed on July 12, 2019 (Doc. 39). Mr. Henderson did not contest detention at that time but reserved the right to seek release at a later time. I denied Mr. Henderson's first Motion for Bail on October 28, 2019. (Doc. 71). After a review of the record, I made seven specific findings of fact:

1. The presumption of detention under the Bail Reform Act applies;

2. Damonico Henderson was involved as a regional leader in a conspiracy to distribute large amounts of controlled substances for over four years;

3. Henderson was under supervision in the Northern District of Ohio for at least a portion of the time he was participating in this conspiracy;

4. Henderson employed others to distribute large amounts of controlled substances in the Northern District of Ohio;

5. Henderson's wife was either a willing participant in his drug distribution or turned a blind eye to his illegal activities, making her an unsuitable third party custodian or companion if he were granted bail;

6. The potential sentence in this case is so great that Henderson's appearance in the past while on bail is not a fair indicator of his likelihood of appearance in this case; and,

7. The strength of the government's case establishes that for over four years Henderson was a continuing threat to the safety of his community and the customers that consumed the drugs he distributed.

(Doc. 71, pp. 4-5).

VI. DISCUSSION OF THE COVID-19 PANDEMIC

We are mindful of the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks it presents.[2] We are also cognizant that the

---

[2] World Health Organization, "WHO characterized COVID-19 as a pandemic" March 25, 2020, available at
https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen

President of the United States has declared a national emergency and that the Governor of the Commonwealth of Pennsylvania[3] has also declared a state of emergency to address the needs of the nation and the Commonwealth respectively. We also recognize that public health officials have strenuously encouraged the public to practice "social distancing," to hand-wash and/or sanitize frequently, and to avoid close contact with others—all of which presents challenges in detention facilities. *See United States v. Martin*, No. PWG-19-140-13, 2020 WL 1274857 *2 (D. Md. Mar. 17, 2020). As of April 4, 2020, 24 cases have been issued around the country citing *Martin*. Of the 24 cases that cite *United States v. Martin,* only three cases released the detainee, 20 cases detained the defendant, and one case granted bail review. In *United States v. Davis*, the judge denied the government motion for pretrial detention because the detention facility already had cases of COVID-19 and

---

[3] Governor Thomas Wolf proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa.C.S. §7301(c) on March 6, 2020. He ordered all non-essential business in the Commonwealth to close on March 20, 2020, and he extended the closure of non-essential businesses and schools "indefinitely" to slow the progression of the pandemic. "Gov. Wolf and Sec. of Health Expand 'Stay at Home' Order to Carbon, Cumberland, Dauphin and Schuylkill Counties, Extend School Closures Indefinitely," March 30, 2020, available at https://www.governor.pa.gov/newsroom/gov-wolf-and-sec-of-health-expand-stay-at-home-order-to-carbon-cumberland-dauphin-and-schuylkill-counties-extend-school-closures-indefinitely/. That Stay at Home Order was extended to all 67 counties on April 2, 2020 to be effective thru April 30, 2020. https://www.pa.gov/guides/responding-to-covid-19/#StayatHomeOrder (last accessed April 4, 2020).

the individual was not a flight risk and posed no serious threat to the community. *United States v. Davis*, No. ELH-20-09, 2020 WL 1529158 (D.Md. Mar. 30, 2020). The case also relied heavily on expert opinion that pretrial facilities are poorly equipped to manage the highly contagious and potentially deadly coronavirus. *Id.* Two out of the three cases were people detained due to immigration proceedings. See *Basank v. Decker*, No. 20-cv-2518 AT, 2020 WL 1481503, (S.D.N.Y. Mar. 26, 2020) and *Coronel, et al. v. Decker, et al.*, No. 20-cv-2472 AJN, 2020 WL 1487274 (S.D. N.Y. Mar. 27, 2020). Additionally, there was one case that only granted review of bail hearings to be assessed on a case to case basis. See *Karr v. State*, No. 4FA-19-00872CR, 2020 WL 1456469 (Alaska Ct. App. Mar. 24, 2020).

In a precedential opinion analyzing a COVID-19 release request in the context of the compassionate release provisions of the First Step Act the Third Circuit concluded that COVID-19 risk alone does not require release where the prison system has a plan in place to deal with the pandemic.

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. *See generally* Federal Bureau of Prisons, *COVID-19 Action Plan* (Mar. 13, 2020, 3:09 PM), https://www.bop.gov/resources/news/20200313_covid-19.jsp. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion

> requirement takes on added—and critical—importance. And given the Attorney General's directive that BOP "prioritize the use of [its] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic," we anticipate that the exhaustion requirement will be speedily dispatched in cases like this one. Memorandum from Attorney Gen. to Dir., Bureau of Prisons 1 (Mar. 26, 2020), https://www.justice.gov/file/1262731/download. So we will deny Raia's motion.

*U.S. v. Raia,* 20-1033, slip op. at 8 (3rd Cir. April 2, 2020)

On March 31, 2020, Judge Jones of this court ordered the immediate release of fourteen men and women held in ICE civil detention in Pike, Clinton and York County facilities. According to Judge Jones, "Each of the petitioners suffers from chronic medical conditions and faces an imminent risk of death or serious injury if exposed to Covid-19." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 2 (M.D. Pa. March 31, 2020. Ruling on their habeas "conditions of confinement" petitions[4] he found that "…a remedy for unsafe conditions need not await a tragic event." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 6 (M.D. Pa. March 31, 2020). His review of the safety procedures at these three immigration facilities found they were insufficient to overcome the speculative risk of infection and death for an "imminent irreparable harm" finding in the TRO context.

---

[4] Petitioners invoked the jurisdiction of the Court under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (original jurisdiction), 28 U.S.C. § 2241 (habeas jurisdiction), and Article I, Section 9, clause 2 of the United States Constitution (the Suspension Clause) (Doc. 1, p. 6).

> The Petitioners' claim is rooted in imminent, irreparable harm. Petitioners face the inexorable progression of a global pandemic creeping across our nation—a pandemic to which they are particularly vulnerable due to age and underlying medical conditions. At this point, it is not a matter of *if* COVID-19 will enter Pennsylvania prisons, but *when* it is finally detected therein. It is not unlikely that COVID-19 is already present in some county prisons—we have before us declarations that portions of the Facilities have been put under ineffective quarantines due to the presence of symptoms similar to COVID-19 among the inmate population. Indeed, we also have reports that a correctional officer at Pike has already tested positive for COVID-19. (footnotes omitted).
>
> . . . .
>
> Based upon the nature of the virus, the allegations of current conditions in the prisons, and Petitioners' specific medical concerns, detailed below, we therefore find that Petitioners face a very real risk of serious, lasting illness or death. There can be no injury more irreparable.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 8,9 (M.D. Pa. March 31, 2020).

Judge Jones cites several immigration detention cases where release has been ordered. *Thakker v. Doll*, 1:20-cv-0480, slip op. at 18-20 (M.D. Pa. March 31, 2020. He balanced the public interest in continued detention this way: "Finally, the public interest favors Petitioners' release. As mentioned, Petitioners are being detained for civil violations of this country's immigration laws." *Thakker v. Doll*, 1:20-cv-0480, slip op. at 23 (M.D. Pa. March 31, 2020.

In concluding that immediate release was required in these fourteen cases Judge Jones said:

> In times such as these, we must acknowledge that the *status quo* of a mere few weeks ago no longer applies. Our world has been altered with lightning speed, and the results are both unprecedented and ghastly. We now face a global pandemic in which the actions of each individual can have a drastic impact on an entire community. The choices we now make must reflect this new reality.
>
> Respondents' Facilities are plainly not equipped to protect Petitioners from a potentially fatal exposure to COVID-19. While this deficiency is neither intentional nor malicious, should we fail to afford relief to Petitioners we will be a party to an unconscionable and possibly barbaric result. Our Constitution and laws apply equally to the most vulnerable among us, particularly when matters of public health are at issue. This is true even for those who have lost a measure of their freedom. If we are to remain the civilized society we hold ourselves out to be, it would be heartless and inhumane not to recognize Petitioners' plight.

*Thakker v. Doll*, 1:20-cv-0480, slip op. at 24 (M.D. Pa. March 31, 2020).

The language of this case is strong and persuasive in the civil detention context. However, to apply this reasoning to prisons and jails across the board in all criminal cases is a much different matter. Different interests must be balanced when a criminal defendant has been detained only after a finding that no condition or combination of conditions will assure the presence of the defendant and the safety of the community. The balancing is likewise different when a criminal defendant is serving a sentence. The question of civil detention, early parole or compassionate release is not before me. This is a decision about bail during a pandemic.

I agree with the Courts that have held that a defendant is not entitled to temporary release under § 3142(i) based solely on generalized COVID-19 fears and

speculation. *United States v. Clark*, No. 19-40068-01-HLT, 2020 WL 1446895 *3 (D. Kan., Mar. 25, 2020). While the court remains sympathetic to the generalized risk regarding the possible complications caused by the COVID-19 virus "[s]uch speculation does not constitute a 'compelling reason' for temporary release." *United States v. Loveings*, Cr. No. 20-51, 2020 WL 1501859 *3 (W.D. Pa. Mar. 30, 2020).

I believe I must make an individualized determination as to whether COVID-19 concerns are compelling in a particular case to justify temporary release under § 3142(i).

VII.   FLIGHT RISK AND DANGER TO THE COMMUNITY

The Government persuasively argues that Mr. Henderson remains a flight risk and a danger to the community. At the outset, the Government noted that there is a presumption of detention for the instant offense under 18 U.S.C. § 3142(e)(3). The Government noted the seriousness of the charges and Mr. Henderson's criminal history. Regarding flight risk, the Government notes the length of sentence Mr. Henderson could face if convicted:

> Nothing about the COVID-19 pandemic limits the defendant's incentive to flee or mitigates the risk that he might do so. 18 U.S.C. § 3142(e)(1).
>
> Henderson's prior criminal convictions . . . were punishable by a range of 0 to 20 years' incarceration for the gun offense. His present offense on the other hand is punishable by a minimum of 15 years' imprisonment and a maximum of life imprisonment. The stakes are considerably higher and therefore his willingness to appear for trial and

> report to prison on his prior cases (for a sentence of less than 3 years' incarceration) loses much of its impact. Additionally, the court in Henderson's 2008 case was evaluating Henderson's likelihood of appearance based on Henderson's record *at that time*. Damonico Henderson's likelihood of appearance today should be judged on his record today. His record today is one who stands before the court as a recidivist, as a person who has been convicted of a prior federal drug and gun felony and who faces a much higher prisoner sentence than the person who faced his first federal offense in 2008.

(Doc. 81, pp. 19-20).

Regarding the danger to the community factor, Mr. Henderson also requires detention. It is alleged that he is involved in a conspiracy to distribute hundreds of kilograms of fentanyl and carfentanil in Pennsylvania and Ohio.

The rebuttable presumption in 18 U.S.C. § 3142(e)(3) reflects a Congressional finding that drug trafficking is a danger to the community and drug traffickers pose special flight risks. That finding has been born out in the current statistics. In the last several years, there have been thousands of drug overdose deaths in Pennsylvania: 4,516 deaths in 2016; 5,398 deaths in 2017; 4,422 deaths in 2018; and 3,811 deaths in 2019.[5] In 2018, Pennsylvania had the fourth highest rate of death due to drug overdose (36.1 per 100,000).[6] According to a DEA report, in 2018,

---

[5] Estimated Accidental and Undetermined Drug Overdose Deaths 2012 – Current, opendataPA, available at https://data.pa.gov/Opioid-Related/Estimated-Accidental-and-Undetermined-Drug-Overdos/m3mg-va8e.

[6] Drug Overdose Deaths, https://www.cdc.gov/drugoverdose/data/statedeaths.html.

twelve (12) people in Pennsylvania died each day due to drug-related overdose.[7] Pennsylvania has not been alone in the opioid crisis, as the death toll across the United States has been alarming. According to the CDC's national data, in the United States, there were 67,367 drug overdose deaths in 2018 and 70,699 deaths in 2017. The recent increase in drug overdose deaths has largely been attributed to opioid use – 47,600 of the 2017 overdose deaths involved opioids.[8] In Pennsylvania, the presence of an opioid was reported in 84% of overdose deaths in 2017 and 82% of overdose deaths in 2018.[9] By comparison, as of noon today (April 16, 2020) there have been seven hundred and seven (707) COVID-19 deaths in Pennsylvania in all of 2020.

I now turn to those factors, specific to Mr. Henderson, that might outweigh the presumption of detention based solely on the current pandemic.

---

[7] DEA Report available at: https://www.dea.gov/sites/default/files/2019-10/PRB%20FINAL%20--%20BUL-132-19%20Drug-Related%20Overdose%20Deaths%20in%20Pennsylvania%2C%202018.pdf .

[8] From the National Institute on Drug Abuse (cited by the CDC) https://www.drugabuse.gov/opioid-summaries-by-state/pennsylvania-opioid-summary .

[9] See DEA Report (supra, note 6)

## VIII. COVID-19 BAIL FACTORS BEYOND STANDARD CONSIDERATIONS

### A. SPECIFIC HEALTH CONCERNS OF THIS DEFENDANT

Mr. Henderson alleges some health issues:

> [Henderson] does have some health issues, including a history of kidney problems and herniated discs. These factors place him in a higher risk of contracting COVID-19. Conditions of pre-trial confinement created the ideal environment for the transmission of contagious disease. His age and medical status place Mr. Henderson at a higher risk of contracting COVID-19 and should be considered in his request for pre-trial release.

(Doc. 77, p. 9).

The Government argues that "[n]either kidney stones nor herniated discs are the type of respiratory or immune system condition that put an individual at heightened risk according to the Centers for Disease Control." (Doc. 81, p. 11). On this issue, I agree with the Government that there is nothing in this record to indicate that "kidney problems" and "herniated disks" create an increased risk of COVID-19.

### B. SPECIFIC CONDITIONS IN THE PLACE OF DETENTION

"The Court is mindful that it bears a fiduciary responsibility to that those that are detained in jails and prisons. The incarcerated look to the Courts for protection of their health, welfare and personal rights in general. However, the Courts are not on the front line. That space is rightly occupied by corrections officials and their

administration."[10] The Chief Judge of this Court issued Standing Order 20-5 on March 25, 2020, requiring all detention facilities where persons are being held by order of this court to notify the Chief Judge and the judicial officer who signed the detention order if a federal detainee is in medical isolation or quarantine for any reason.[11] As of the filing of this Opinion, no notice has been received from the Lycoming County Prison that Mr. Henderson is in medical isolation or quarantine for any reason.

The Government has proffered specific evidence about the procedure being used in Lycoming County to curtail the spread of COVID-19. (Doc. 81-1). These precautions seemed to be consistent with the CDC Guidelines for Detention

---

[10] *United States v. Williams*, No. PWG-13-544, 2020 WL 1434130 (slip copy) (D. Md. Mar. 24, 2020).

[11] "…Further, each detention center shall promptly notify the Marshal for this District of any federal detainee who is in medical isolation or quarantine at their facility for any reason, promptly upon the entry of such detainee into such status. The Marshal shall then so notify the undersigned and the judicial officer who entered the Order of commitment of such status.

The Clerk's Office is DIRECTED to transmit a copy of this Order to the U.S. Marshal, who shall advise each involved detention center of its content, and who shall provide a copy of same to each detention center and each relevant law enforcement agency."
Standing Order 20-5, https://www.pamd.uscourts.gov/news/standing-order-2020-005 (last accessed April 4, 2020).

Facilities.[12] The Pennsylvania Supreme Court issued an Order on April 3, 2020 directing each county president judge to work with the relevant stakeholders to fashion localized plans for dealing with COVID-19 in county jails:

> We DIRECT the President Judges of each judicial district to coordinate with relevant county stakeholders to ensure that the county correctional institutions in their districts address the threat of COVID-19, applying the recommendations of public health officials, including the CDC's Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities (Mar. 23, 2020). If utilization of public health best practices is not feasible due to the population of the county correctional institutions, President Judges should consult with relevant county stakeholders to identify individuals and/or classes of incarcerated persons for potential release or transfer to reduce the current and future populations of the institutions during this health crisis with careful regard for the safety of victims and their communities in general, with awareness of the statutory rights of victims, and with due consideration given to public health concerns related to inmates who may have contracted COVID-19. Moreover, consistent with these above considerations, President Judges are to undertake efforts to limit the introduction of new inmates into the county prison system.[13]

There is nothing before this Court to indicate that any specific problem has developed at the Lycoming County Prison.

---

[12] http://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

[13] *In Re: The Petition Of The Pennsylvania Prison Society*, No. 70-MM-2020, slip op. at pp. 2-3 (Pa. April 3, 2020) (per curiam).

C. NUMBER OF CONFIRMED CASES

Based on the evidence before me at this time, there are no confirmed cases of COVID-19 in the Lycoming County Prison. In all of Lycoming County, where the prison is located, there are thirty (30) cases and zero deaths as of noon today (April 16, 2020). While these numbers are not guaranteed into the future, they do not suggest an immediate and unavoidable risk. Mr. Henderson wishes to return to his home in Elyria, Ohio, which is in Lorain County. As of noon today, there are one hundred and ninety-one (191) confirmed cases and seven (7) deaths.

D. RELEASE PLAN

Mr. Henderson proposes a return to Elyria, Ohio and live with his wife, Stephanie. On April 7, 2020, Counsel provided the following proffer via email to the Court and Opposing Counsel:

1. Proposes third party custodian – Natisha Raymore Bowling; d/o/b – 7/16/71; 3964 Colony Road, South Euclid, OH 44118; she is Mr. Henderson's first cousin; she is his mother's sister only daughter; she is employed as the associate director at Fatima Family Center in Cleveland. She is also an adjunct professor of education at Cuyahoga Community College. She has no criminal record. She owns her own home and resides there with her daughter Kyla Bowling -d/o/b 2/2/06.

Mr. Henderson also notes that he was employed at Harkness Services[14] and anticipates return to that employment upon release. However, the proffer by counsel about work during the Pandemic is very vague.

    2. Mr. Henderson would be employed by Harkness Services. 52 E. Summit St. suite D, Norwalk, OH 44857; 419-706-5211 or 888-959-4203 x 102. His direct supervisor would be Chris Harkness or Cornell Smith; Mr. Henderson's pay would be between $15-$20 per hour depending on the work to be completed; anticipated hours during COVID19 shutdown would be approximately 6-24 hours per week unless assignment calls for more; location of work would be northern Ohio and Columbus area up; the nature of the work during this time will be special assignment and on call. Some of the constant work will be shared with other employees. This work could fluctuate dramatically once normal operations resume.

An additional basis for his requested relief was the illness of his son. I asked counsel to provide specifics and he proffered the following:

    3. His son Darien Tyler Henderson – d/o/b 11/11/94; 100 Euclid St. Elyria, OH 44035. Works for Olive Garden parent company. Was admitted recently to University Hospital overnight. No diagnosis yet. Scope performed in stomach because of excessive vomiting and esophagus for damage. A mass was found in stomach. Another scope was scheduled in March, but cancelled due to COVID-19 outbreak. April appointment also cancelled. Now on hold indefinitely. Family concerned about cancer as it runs sting on both sides of family. Darien emotionally distraught.

---

[14] According to their website, Harkness Services is a "business specializing in quality restaurant and kitchen exhaust and hood cleaning services." (available at http://harknessservices.com/about-the-company/).

While I appreciate the efforts of Counsel to provide this additional detail, my previous decision on this issue of detention is not changed by these new facts.

IX.   CONCLUSION

For all of reasons set forth above, Mr. Henderson has failed to rebut the presumption of detention, and further he is not entitled to a reconsideration of our Order of Detention under 18 U.S.C. § 3142(i). Therefore, his motion for bail will be denied. An appropriate order follows.

Date: April 16, 2020                              BY THE COURT

*s/William Arbuckle*
William Arbuckle
U.S. Magistrate Judge